# No. 14-4748

## 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘 𝖋𝖔𝖗 𝖙𝖍𝖊 𝕾𝖊𝖈𝖔𝖓𝖉 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

---

C & L INTERNATIONAL TRADING INC., and KAM NG,

*Plaintiffs-Appellants,*

K & C INTERNATIONAL TRADING INC.,

*Plaintiff,*

*v.*

AMERICAN TIBETAN HEALTH INSTITUTE, INC., CHUNG KEE (USA) INTERNATIONAL INC., YAT CHAU (USA) INC., TUNG REN TANG, RON FENG TRADING INC., YONG LONG SUPERMARKET INC., KANG LI TRADING INC., and PO WING HONG FOOD MARKET INC.,

*Defendants-Appellees,*

FARGO TRADING INC.,

*Defendant.*

---

*On appeal from the Amended Opinion and Injunction dated December 3, 2014, entered by the Honorable Louis L. Stanton, United States District Court for the Southern District of New York in Civil Actions Nos. 13-cv-2368 and 13-cv-2763*

---

## APPELLANTS' BRIEF

---

MITCHELL M. WONG
*Counsel of Record*
ASHMASONS LLP
Forty Wall Street, Floor 28
New York, New York 10005
(212) 671-1068
mitchell.wong@ashmasons.com

*Counsel for Appellants*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1,

Appellant C&L International Trading Inc. discloses that it is not

a publicly held corporation, has no parent corporation, and no

publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT

TABLE OF CONTENTS ............................................................................... i

TABLE OF AUTHORITIES........................................................................iv

PRELIMINARY STATEMENT.................................................................... 1

STATEMENT OF JURISDICTION ............................................................. 8

STATEMENT OF RELATED CASES ......................................................... 9

STATEMENT OF THE ISSUES ................................................................ 11

STATEMENT OF THE CASE.................................................................... 12

STATEMENT OF FACTS.......................................................................... 16

    A.    Factual Background .............................................................. 16

    B.    Relevant Trademark Registrations ...................................... 19

    C.    Proceedings Below ............................................................... 21

SUMMARY OF ARGUMENT................................................................... 24

STANDARD OF REVIEW ........................................................................ 25

ARGUMENT.............................................................................. 26

I.    The expression "Tibetan *baicao* tea"
      cannot be monopolized as a trademark
      for Tibetan herbal teas. .......................................... 26

      A.    The expression "Tibetan *baicao* tea"
            translates into "Tibetan herbal tea.".......................... 26

            1.    The district court implicitly found
                  that the term "*baicao*" means "herbal." ......... 26

            2.    This Court can also take judicial
                  notice from popular literature and
                  free internet translators that the
                  term "*baicao*" means "herbal." ....................... 34

            3.    In related proceedings, the U.S.
                  Patent & Trademark Office has
                  determined that the term "*baicao*"
                  means "herbal." ................................................. 37

            4.    Even ATHI implicitly had
                  acknowledged that the term
                  "*baicao*" means "herbal." ................................. 42

      B.    The adjective "Tibetan" cannot be
            trademarked here because it is
            descriptive of the Tibetan herbal teas at
            issue............................................................................ 45

      C.    The freedom to use geographic terms as
            descriptive product names is especially
            important for teas....................................................... 50

II.    The "catch-all" provisions of Paragraphs 1
       and 9 do not state the acts enjoined with the
       specificity required by Fed.R.Civ.P. 65(d). ........................ 55

       A.    The acts that Paragraph 9 seeks to enjoin
             are not adequately specified, nor narrowly
             tailored to the issues tried below. ............................. 55

       B.    The acts that Paragraph 1 seeks to enjoin
             are not adequately specified, nor narrowly
             tailored to the issues tried below. ............................. 63

III.   Even if the expression "Tibetan *baicao* tea"
       could be trademarked, the district court
       should have denied injunctive relief on the
       doctrine of unclean hands. .................................................. 66

IV.    The issues raised on this appeal can be
       remedied directly by vacatur without
       further proceedings. ............................................................ 76

CHART SUMMARIZING TRANSLATION
ISSUES OVER "TIBETAN *BAICAO* TEA" ............................................ 80

CONCLUSION .......................................................................................... 81

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Statutes and Codes:**

15 U.S.C. § 1052(e)(2) ............................................................ 5, 47, 49

15 U.S.C. § 1115(b)(4) ............................................................ 5, 47, 50

15 U.S.C. § 1125(a)(1) ............................................................... 58-59

FED.R.CIV.P. 65(d)(1)(B) ................................................................ 56

FED.R.CIV.P. 65(d)(1)(C) ................................................................ 56

FED.R.EVID. 201(b)(2) ............................................................... 34, 37


**Cases:**

Bowman Transp., Inc. v.
Arkansas-Best Freight System, Inc.,
    419 U.S. 281 (1974) ............................................................ 32, 34

Canal Co. v. Clark,
    80 U.S. (13 Wall.) 311 (1872) ............................. 5, 45-47, 50, 54

Chase Manhattan v. American Nat. Bank,
    93 F.3d 1064 (2d Cir. 1996) .................................................... 77

City of New York v. Mickalis Pawn Shop, LLC,
    645 F.3d 114 (2d Cir. 2011) ........................ 6, 57, 60-61, 63, 66

Design Strategy, Inc. v. Davis,
  469 F.3d 284 (2d Cir. 2006) .................................................. 25

Hirsch v. Arthur Andersen & Co.,
  72 F.3d 1085 (2d Cir. 1995) .................................................. 35

King v. Commissioner,
  458 F.2d 245 (6th Cir. 1972) .................................................. 77

Lineback v. Spurlino Materials, LLC,
  546 F.3d 491 (7th Cir. 2008) ........................... 57, 60-61, 63, 66

Male v. Crossroads Associates,
  469 F.2d 616 (2d Cir. 1972) .................................................. 77

Malletier v. Burlington Coat Factory Warehouse Corp.,
  426 F.3d 532 (2d Cir. 2005) .................................................. 25

Meccano v. Wanamaker,
  253 U.S. 136 (1920) ................................................................ 25

Peregrine Myanmar Ltd. v. Segal,
  89 F.3d 41 (2d Cir. 1996) .....................................6-7, 59, 62-63

Register. com, Inc. v. Verio, Inc.,
  356 F.3d 393 (2d Cir. 2004) .................................................. 25

Rosemont Enterprises, Inc. v. Random House, Inc.,
  366 F.2d 303 (2d Cir. 1966) .................................................. 67

Rothman v. Gregor,
  220 F.3d 81 (2d Cir. 2000) .................................................. 35

Schmidt v. Lessard,
       414 U.S. 473 (1974) .................................................... 56

Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,
       588 F.3d 97 (2d Cir. 2009) ....................................... 25

Stetson v. Howard D. Wolf & Assocs.,
       955 F.2d 847 (2d Cir. 1992) ..................................... 77

**Secondary Authorities:**

Dictionary.com (entry for definition of "Tibetan"),
http://dictionary.reference.com/browse/tibetan?s=t
(last visited Feb. 24, 2015) ............................................ 48

HELEN SABIERI, TEA, A GLOBAL HISTORY
(Reaktion Books 2010) ................................................ 51

ZHI GANG SHA, TAO II: THE WAY OF HEALING,
REJUVENATION, LONGEVITY, AND IMMORTALITY
(Atria Books 2010) ........................................... 8, 37, 67-68

DAVID A. TAYLOR, GINSENG, THE DIVINE ROOT
(Algonquin 2006) ....................................................... 52

9A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL
PRACTICE AND PROCEDURE § 2577 (2d ed. 1994) ........................ 77

## PRELIMINARY STATEMENT

This appeal concerns a trademark dispute between two sets of competing tea merchants.

The Appellants are tea merchants headquartered in New York (hereinafter, "New York merchants"). The Appellee ATHI is a competing tea business headquartered in California.

Both sets of tea-makers sell herbal teas formulated in Tibet. Both sets of tea-makers also describe their Tibetan herbal teas using the same English-language and Chinese-language expressions. Specifically, both tea-makers use the expression "Tibetan *Baicao* Tea," as well as that expression's Chinese equivalent ("西藏百草茶"). These competing enterprises brought the actions below to contest their respective rights to these expressions.

The trial court initially entered a permanent injunction against the New York merchants, forbidding the New York merchants from using the expressions "*baicao*,"[1] "*baicao* tea,"[2] and "Tibetan *baicao*

---

[1]     A90-A91 ¶¶ 9, 13 & 14.

tea."[3]  The injunction further enjoined the use of these expressions "in any language, including but not limited to English, Chinese, or Tibetan transliterations."[4]

The New York merchants objected to the scope of the injunction.  Specifically, the New York merchants pointed out that the enjoined term *baicao* was the *pinyin* Romanization of the Chinese characters for "herbs" or "herbal."  Thus, the injunction barred the New York merchants—who made their living selling herbal teas in the Chinese community—from using the everyday Chinese words for "herbal" ("*baicao*"), "herbal tea" ("*baicao* tea"), and "Tibetan herbal tea" ("Tibetan *baicao* tea") "in any language, including but not limited to English, Chinese, or Tibetan."[5]

The New York merchants invited the district court to confirm *baicao*'s translation simply by copying the two Chinese characters for

_____

[2]      A91 at ¶12.

[3]      A90 at ¶7.

[4]      A91 at ¶14.

[5]      A91 at ¶14.

*baicao* ("百草") into either Google's free internet translator[6] or

Microsoft's free internet translator[7].

In contrast, ATHI argued that the injunction ought not be

amended at all.[8]  Despite the Google® and Microsoft® translations,

ATHI vehemently denied any such translation: "[C]ertainly the term

'herbal' actually does not translate to 'Baicao' at all."[9]

Instead, ATHI claimed that the term *baicao* "doesn't mean

anything,"[10] and was a "fanciful term that [ATHI's president] came

up with"[11] approximately six years ago on April 8, 2009[12].  ATHI's

arguments echoed the statements they repeatedly made before the

U.S. Trademark Office that "[t]he wording 'BAICAO' has no meaning

in a foreign language."[13]

---

[6]     http://translate.google.com/

[7]     http://www.bing.com/translator/

[8]     A145, at lines 8-9.

[9]     A143-A144, at lines 7:25-8:1.

[10]    A144, at line 12.

[11]    A144, at lines 17-19.

[12]    A59 (ATHI claiming date of its "First Use" of the term *baicao* as "Apr. 08, 2009").

[13]    A59 (Translation statement), A28 (same) & A30 (same).

After conducting several hearings on the issue, the district court amended the initial injunction to strike all references to "*baicao*" (i.e., "herbal") or "*baicao* tea" (i.e., "herbal tea").[14] However, the district court nonetheless maintained that the expression "Tibetan *baicao* tea" was still protectable. The district court thus continues to bar permanently the New York merchants from using the term "Tibetan *baicao* tea""in English or any foreign equivalent."[15]

A chart summarizing the translation issues in this case appears on Page 80 near the back of this brief. From the amended injunction, the New York merchants now appeal on three grounds.

First, the district court erred in believing that the addition of the geographic adjective "Tibetan" to the otherwise unprotectable terms "*baicao* tea/herbal tea" imbued the collective term "Tibetan *baicao* tea"

---

[14]    Compare A90-A91 ¶¶ 10 & 12-14 (original June injunction's provisions for "*baicao*" and "*baicao* tea") with A185-A186 at ¶¶ 1-9 (December amended injunction's provisions).

[15]    A186 at ¶7.

with trademark rights.[16]  Both the Trademark Act[17] and the Supreme Court[18] unambiguously teach that the names of geographic locations can never serve as a trademark when those terms are used to draw a geographic connection.

Second, the district court erred by inserting Paragraphs 1 and 9 as "catch-all" provisions intended to regulate all potential future interactions between ATHI and the New York merchants, including interactions unrelated to this action.  These two Paragraphs are defective under Fed.R.Civ.P. 65(d) for three reasons:

---

[16]    A149, at lines 22-25 ("It seems to me that the true vision of the situation is that the trademark is 'Tibetan Baicao Tea,' and that's what should be protected, other than any single word in the group.").

[17]    15 U.S.C. § 1052(e)(2) (authorizing Trademark Office to refuse registration for any mark which "is primarily geographically descriptive"; 15 U.S.C. § 1115(b)(4) (establishing defense against infringement for marks used to describe "geographic origin" of goods or services).

[18]    Canal Co. v. Clark, 80 U.S. (13 Wall.) 311, 324-25 (1872) (geographic names "point only at the place of production, not to the producer, and [if] they [could] be appropriated exclusively, the appropriation would result in mischievous monopolies").

(A)    Paragraph 9 was couched in language almost verbatim to

the trademark statute, in violation of the rule that an

injunction must provide more detail than just an

exhortation to obey the law. [19]

(B)    Paragraph 9's provisions covered all ATHI goods—

including countless ATHI goods that were not the subject

of the underlying actions—in violation of the rule that

injunctions should be narrowly tailored to cover only the

subject matter of the litigation.[20]

Similarly, Paragraph 1's command that the New

York merchants not run afoul of ATHI's "product

branding or packaging" [21] was inappropriately overbroad

---

[19]    Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41, 51 (2d Cir. 1996)
("[A]n injunction must be more specific than a simple
command that the defendant obey the law.").

[20]    City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114,
144 (2d Cir. 2011) ("[I]njunctive relief should be 'narrowly
tailored to fit specific legal violations,' and that the court must
'mould each decree to the necessities of the particular case.'")
(collecting cases) (citations omitted).

[21]    A185 at ¶ 1.

where the district court had ruled explicitly that the

issues litigated "[we]re the words ['Tibetan *baicao* tea']"[22]

and "<u>not</u> the pictures"[23] that comprised the "product

branding or packaging" that Paragraph 1 sought to

regulate.

(C)   Finally, by describing the acts to be enjoined by reference

to how others might react to the New York merchants'

future actions, Paragraph 9 does not detail the enjoined

acts with sufficient certainty.[24]

<u>Third</u>, in view of the objectively unreasonable stances taken by

ATHI in connection with the term "*baicao*," the district court should

have denied any injunctive relief under the doctrine of unclean

hands.  In view of Google's translation, Microsoft's translation, and

---

[22]   A160, at lines 10-16.

[23]   A160, at lines 10-16 (emphasis added).

[24]   <u>Peregrine Myanmar</u>, 89 F.3d at 51 (2d Cir. 1996) (Injunction
       requiring litigant to "take all other reasonably needful actions
       to facilitate plaintiffs' resumption of their management
       authority in [two businesses]" was also held to violate Rule 65
       because there was no way for the litigant "to know what 'all
       other reasonably needful actions' mean[t].").

most damningly, a *New York Times* bestseller's book specifically identifying the term *baicao* as "famous [and] ancient,"[25] ATHI's argument that it had invented the term *baicao* approximately six years ago on April 8, 2009[26] was so objectively unreasonable that it amounted to the work of unclean hands.

For these reasons, the New York merchants request that this Court vacate the district court's amended injunction.

## STATEMENT OF JURISIDCTION

This Court is authorized to exercise appellate jurisdiction pursuant to 28 U.S.C. § 1292(a)(1). Subject-matter jurisdiction over the underlying claims is provided by 28 U.S.C. §§ 1331 & 1367.

---

[25]  ZHI GANG SHA, TAO II: THE WAY OF HEALING, REJUVENATION, LONGEVITY, AND IMMORTALITY 21 (Atria Books 2010) [hereinafter, SHA, "TAO II"].

[26]  A59 (alleging date of "First Use" of the term *baicao* as "Apr. 08, 2009").

## STATEMENT OF RELATED CASES

There are four proceedings related to this appeal:

(1)     As acknowledged by the district court in Paragraph 9[27] of the

original June injunction, on Apr. 3, 2013, Appellee ATHI filed

U.S. Trademark Application Serial No. 85/894,301 with the U.S.

Patent & Trademark Office ("USPTO") for the mark

"西藏百草茶" [Chinese for "Tibetan *Baicao* Tea"].  Pursuant to

37 C.F.R. §2.67 and TMEP §§716.02(a), (c)-(d), on January 30,

2014, the USPTO, acting on its own initiative, suspended

consideration of the application pending the termination of the

underlying actions.[28]

(2)     As acknowledged by the district court in Paragraph 10[29] of the

original June injunction, on May 22, 2013, Appellee ATHI filed

U.S. Trademark Application Serial No. 85/939,652 with the

---

[27]     A90 at ¶9.

[28]     Suspension Notice from U.S. Trademark Examiner Curtis
French, U.S. Trademark Application Serial No. 85/894,301
<http://tsdr.uspto.gov/documentviewer?caseId=sn85894301&do
cId=SUL20140130173508#docIndex=0&page=1> (Jan. 30, 2014).

[29]     A90 at ¶10.

USPTO for the mark "*Baicao*" with the U.S. Patent & Trademark

Office ("USPTO"). Pursuant to 37 C.F.R. §2.67 and TMEP

§§716.02(a), (c)-(d), on January 30, 2014, the USPTO, acting on

its own initiative, suspended consideration of the application

pending the termination of the underlying actions.[30]

(3)   On November 21, 2013, Appellee ATHI commenced a civil

action in the Supreme Court of the State of New York, New

York County, styled American Tibetan Health Institute v. K&C

Int'l Trading Inc., No. 654038/13, seeking cancellation of

Defendant K&C Int'l Trading Inc.'s New York trademark

registration for its tea packaging. This New York State action is

currently pending.

(4)   On September 8, 2014, Appellee ATHI filed a Petition for

Cancellation, No. 92059991, with the USPTO of Appellant Ms.

Ng's U.S. Trademark Registration No. 4,247,693 ["Tibetan

---

[30]   Suspension Notice from U.S. Trademark Examiner Curtis
French, U.S. Trademark Application Serial No. 85/939,652
<http://tsdr.uspto.gov/documentviewer?caseId=sn85939652&do
cId=SUL20140130173453#docIndex=0&page=1> (Jan. 30, 2014).

— 10 —

*Baicao* Tea"].  On February 9, 2015, the Trademark Trial and

Appeal Board suspended proceedings pending a response from

Ms. Ng.[31]

## STATEMENT OF ISSUES

1.  Can a retailer of Tibetan herbal teas prevent competing

    merchants from using the expression "Tibetan herbal tea" (in

    English or any foreign equivalent) to market Tibetan herbal

    teas?

2.  Do the "catch-all" provisions embodied by Paragraphs 1 and 9

    of the Amended Injunction state the acts to be enjoined with the

    degree of specificity required by Fed.R.Civ.P. 65(d)?

3.  Should the Appellee's objectively unreasonable arguments in

    the district court and the Trademark Office concerning the

---

[31]    Decision of the United States Trademark Trial and Appeal
        Board denying ATHI's Motion for Default Judgment at 3
        <http://tsdr.uspto.gov/caseviewer/pdf?caseId=4247693&docInd
        ex=1#docIndex=1> (Feb. 9, 2015) ("Pending a response to this
        order from Respondent, the cancellation proceeding is
        **SUSPENDED**.") (emphasis in original).

meaning of the term "*baicao*" bar equitable relief under the

doctrine of unclean hands?

## STATEMENT OF THE CASE

This appeal arises out of two separate actions brought by

competing tea businesses.  The Appellants are tea merchants from

New York, and the Appellee is a tea company from California.

The litigants brought dueling actions against each other in the

U.S. District Court for the Southern District of New York over tea

descriptions containing the Chinese-*pinyin* term "*baicao*."  The

separate actions were consolidated before The Honorable Louis L.

Stanton, and ATHI moved for a preliminary injunction.

The district court consolidated the preliminary-injunction

hearing with a limited jury trial under Fed.R.Civ.P. 65(a)(2).  At the

limited trial, only two questions were put to the jury: (1) which of the

parties had made first use of the marks with the *baicao* term; and (2)

whether ATHI had abandoned its mark when ATHI stopped using the mark for 10 months.[32]

The jury found in favor of ATHI on both these questions: the jury concluded that ATHI used the *baicao*-containing names first, and that ATHI had not abandoned the marks.[33]  Upon these findings, on June 25, 2014, the district court issued a permanent injunction prohibiting the New York merchants from using the term *baicao*[34] or any phrase containing the expression *baicao* in connection with the sale of herbal teas.[35]

The New York herbal-tea merchants immediately objected to the scope of the injunction.  Specifically, the New York merchants pointed out that the term "*baicao*" means "herbs" or "herbal" in Chinese.  The New York merchants invited[36] the district court to

---

[32]  A179.

[33]  A179.

[34]  A90 at ¶¶ 10 & 14.

[35]  A90 at ¶¶ 7, 9 & 12-13.

[36]  A142-A143, at lines 6:25-7:4 ("The term 'Baicao' is necessarily understood to be 'herbal.' It can be verified by typing it into Google Translate or Microsoft's search engine. We can all see

confirm this translation simply by copying-and-pasting the two

Chinese characters for *baicao* ("百草") into reliable and free internet

translation services such as Google Translate[37] or Microsoft's Bing

Translator[38].  Under these translations, the injunction would therefore

have given ATHI a monopoly over the common descriptive terms

"herbal," "herbal tea" or "Tibetan herbal tea," which are

unprotectable under trademark law.

  In response ATHI claimed that the term *baicao* did not involve

descriptive terms at all.  According to ATHI, the term *baicao* "d[id]n't

mean anything,"[39] but rather, was "a fanciful term"[40] that ATHI's

_____

  that it translates from Chinese into English as 'herbal.'"); A153,
at lines 15-18 ("I do have copies of the printouts from both
Google Translate and from Microsoft Bing showing you that
the expression 'Baicao' in fact does translate into the word
'herbal' or 'herbs.'").

[37] http://translate.google.com/
[38] http://www.bing.com/translator/
[39] A144, at line 12.
[40] A144, at lines 17-19.

— 14 —

president invented on April 8, 2009[41].  "[C]ertainly," ATHI asserted, "the term 'herbal' actually does not translate to 'Baicao' at all."[42]

After conducting several hearings on the issue, the district court concluded that the term *baicao* did indeed "have much broader and separate meanings."[43]  On December 3, 2014, the district court thereupon amended the original June 25, 2014 Injunction to remove all protections for "*baicao*" (i.e., "herbal") and "*baicao* tea" (i.e., "herbal tea").[44]

However, the district court maintained that "Tibetan *baicao* tea" (i.e., "Tibetan herbal tea") still could properly be trademarked.  Thus, under the Amended Injunction, the New York merchants, who sell Tibetan herbal teas, remain barred from using the expression "Tibetan herbal tea" to describe their products.[45]

---

[41]     A59 (alleging date of "First Use" of the term *baicao* as "Apr. 08, 2009").

[42]     A143-A144, at lines 7:25-8:1.

[43]     A146, at lines 22-23.

[44]     A178-A187.

[45]     A185-A186 at ¶¶ 2-8.

From the Amended Injunction, the New York merchants filed a

timely Notice of Appeal on December 26, 2014.  Neither the June 25,

2014 Opinion and Injunction nor the December 3, 2014 Amended

Opinion and Injunction are reported.

## STATEMENT OF FACTS

**A.    Factual Background**

The Appellants are two tea merchants in New York.  The

Appellee ATHI is a competing tea company from California.

Around 2009 or 2010, both the New York merchants and

ATHI began selling herbal teas connected with Tibet.  Both sets

of businesses used the name "Tibetan ***baicao*** tea" to market

their products.  [Emphases added.]

It is undisputed that the term *baicao* in "Tibetan *baicao*

tea" is the *pinyin* Romanization of two Chinese characters:

"百草."  It is also undisputed that these two Chinese characters

("百草") are the third and fourth characters in the Chinese-

language version of "Tibetan *Baicao* Tea" ("西藏<u>百草</u>茶")
(emphasis added).

When the two Chinese characters for *baicao* ("百草") are
copied-and-pasted into reliable language-translation websites,
such as those powered by Google®[46] or Microsoft®[47], the
Chinese characters translate into "herbs." In other words, the
name "Tibetan *Baicao* Tea" translates as "Tibetan Herbal Tea."

ATHI disputes the translations provided by Google® and
Microsoft®. ATHI persists that "certainly the term 'herbal'
actually does not translate to 'Baicao' at all."[48] Instead,
according to ATHI, the term *baicao* was a "fanciful term that [its
president] came up with"[49] approximately six years ago on
April 8, 2009[50].

---

[46]   http://translate.google.com/

[47]   http://www.bing.com/translator/

[48]   A143-A144, at lines 7:25-8:1.

[49]   A144, at lines 17-19.

[50]   A59 (alleging date of "First Use" of the term *baicao* as "Apr. 08,
2009").

— 17 —

By an uncanny coincidence, both sets of competing tea companies initially engaged the same tea-packaging company to box their teas.  The tea-packaging company furnished the same box design to both sets of tea merchants.  Thus, for several months in 2009, apparently unbeknownst to either set of merchants, both sets of competing merchants marketed their teas using the same box design.

In December 2009, however, the New York merchants changed the design of their packaging such that it no longer resembled the original box.  The only design elements now common to the original box and the new packaging are the words "Tibetan *Baicao* Tea" in English and in Chinese.

ATHI's package design can be seen in the Appendix at pages A68-A69, and the New York merchants' package design can best be seen at A76-A81.  (The exhibit reproduced at A76-A81 is a clear color image of a PACER filing that was difficult to

read.  In the interests of completeness, the original PACER

filing has been reproduced at A70-A75.)

**B.    Relevant Trademark Registrations**

Both sides also sought trademark registration for their

product names.  In 2011, one of the New York merchants (Ms.

Ng) registered the design of her product packaging as a New

York State trademark, and in 2012, she also registered the name

"Tibetan *Baicao* Tea" as a federal trademark[51].

Meanwhile, in 2012, ATHI sought trademark registration

for the expressions "*Baicao*,"[52] "Tibetan *Baicao* Tea,"[53] and the

Chinese translation of "Tibetan *Baicao* Tea" ("西藏百草茶")[54].

Additionally, in 2013, ATHI obtained U.S. copyright

registration for its product packaging.

The trademark applications were distinguishable in at

least one very material respect.  In the New York merchant's

---

[51]    A52.

[52]    A59-A61.

[53]    A57.

[54]    A53-A55.

trademark applications, she candidly disclosed that the word *baicao* meant herbal, and that the expression "Tibetan *baicao* tea" translated into "Tibetan herbal tea." Specifically, she declared that "[t]he non-Latin characters in the mark transliterate to 'Tibetan bai cao tea', and this means 'Tibetan herbal tea' in English," and that "[t]he English translation of 'baicao' in the mark is 'herbs.'"[55]

In contrast, in ATHI's trademark applications for the terms "*baicao*," "Tibetan *baicao* tea," and the five Chinese characters for "Tibetan *baicao* tea," ATHI repeatedly told the U.S. Trademark Office during the <u>ex</u> <u>parte</u> application proceedings that "The wording 'BAICAO' has no meaning in a foreign language."[56]

---

[55]  A52.

[56]  <u>See</u> <u>respectively</u> A59(certifying that "The wording 'BAICAO' has no meaning in a foreign language."); A57 (certifying that "The word(s) 'baicao' ha[ve] no meaning in a foreign language.") & A53 (certifying that "The wording 'BAICAO' has no meaning in a foreign language.").

C.    **Proceedings Below**

After obtaining its trademark registration for Tibetan *Baicao* Tea, the New York merchant discovered local sales of tea using the "Tibetan *Baicao* Tea" name.  Relying on the Trademark Office's approval of her trademark registration as an indication that she now enjoyed federal protection for the mark, on April 22, 2013, the New York merchants brought action against the local retailers for trademark infringement in the Southern District of New York.  The New York merchants later added ATHI as a defendant to the action as well.

Three days after the New York merchants initiated suit, on April 25, 2013, ATHI counter-sued by bringing a separate action against the New York merchants, also in the Southern District of New York.  ATHI's counter-suit was based substantially on its own "Tibetan *Baicao* Tea" registration,

which had been procured with the certification that "The word(s) 'baicao' ha[ve] no meaning in a foreign language."[57]

Both cases were then consolidated, and ATHI moved for a preliminary injunction. Pursuant to Fed.R.Civ.P. 42(b), the trial court consolidated ATHI's preliminary-injunction motion with a separate trial on two issues: (1) which party made first use of its mark in commerce in the United States, and (2) if ATHI were the first user, whether ATHI later abandoned the mark.

A jury tried these two issues from March 24 to 27, 2014, and rendered a verdict in favor of ATHI on both issues: the jury found that ATHI was the first user, and that ATHI did not abandon the mark.

On June 25, 2014, the district court entered a permanent injunction.[58] The injunction initially barred the New York

---

[57]     A57.

[58]     A82-A94.

merchants from using the terms "*baicao*,"[59] "*baicao* tea,"[60] and "Tibetan *baicao* tea."[61]

The New York merchants objected that the term "*baicao*" meant "herbal," and the June 25 injunction therefore forbade them (as merchants of Tibetan herbal teas) from using the words "herbal," "herbal tea" and "Tibetan herbal tea."

On December 3, the district court thereupon amended the injunction, striking all protections for the terms "*baicao*" (<u>i.e.,</u> "herbal") and "*baicao* tea" (<u>i.e.,</u> "herbal tea").[62]  However, the district court left in place the prohibition against the New York merchants from using the expression "Tibetan *baicao* tea" (<u>i.e.,</u> "Tibetan herbal tea").[63]

---

[59]    A90-A91 ¶¶ 9, 13 & 14.

[60]    A91 ¶12.

[61]    A90 ¶7.

[62]    A178-A187.

[63]    A185-A186 ¶¶ 2-8.

— 23 —

From the December 3, 2014 amended injunction, the New

York merchants filed a timely Notice of Appeal on December

26, 2014.

## SUMMARY OF ARGUMENT

1. The expression "Tibetan *baicao* tea"—whether "in English or

any foreign equivalent,"[64] or "its Chinese equivalent"[65]—is

descriptive of Tibetan herbal teas and therefore cannot be

trademarked.

2. The "catch-all" provisions of Paragraphs 1 and 9 do not state

the acts to be enjoined with the specificity required by

Fed.R.Civ.P. 65(d), and were not narrowly tailored to the issues

tried below.

3. In view of the objectively unreasonable representations

concerning the meaning of the term "*baicao*," the doctrine of

---

[64]     A186 at ¶7.

[65]     A187 at ¶2.

unclean hands should have precluded ATHI from enjoying <u>any</u> injunctive relief.

## STANDARD OF REVIEW

A district court's decision to grant an injunction is reviewed for "abuse of discretion and also whether the grant was 'contrary to some rule of equity.'"[66]  "To constitute an abuse of discretion, the district court's decision must have rested on an error of law or a clearly erroneous finding of fact."[67]  In assessing whether the injunction "rested on an error of law," a reviewing court "give[s] no deference to the district court's conclusions of law, which it review[s] <u>de novo</u>,"[68] along with "mixed questions of law and fact"[69]

---

[66]    <u>Register. com, Inc. v. Verio, Inc.</u>, 356 F.3d 393, 423 (2d Cir. 2004) (<u>citing</u> <u>Meccano v. Wanamaker</u>, 253 U.S. 136, 141 (1920) & <u>Coca-Cola Co. v. Tropicana Products, Inc.</u>, 690 F.2d 312, 315 (2d Cir. 1982)).

[67]    <u>Malletier v. Burlington Coat Factory Warehouse Corp.</u>, 426 F.3d 532, 537 (2d Cir. 2005).

[68]    <u>Register. com</u>, 356 F.3d at 423 (2d Cir. 2004).

[69]    <u>Starbucks Corp. v. Wolfe's Borough Coffee, Inc.</u>, 588 F.3d 97, 105 (2d Cir. 2009) (<u>citing</u> <u>Design Strategy, Inc. v. Davis</u>, 469 F.3d 284, 300 (2d Cir. 2006)).

Applying these principles to the case at bar, the question of whether ATHI's "Tibetan *baicao* tea" registration was too descriptive to receive trademark protection is reviewed <u>de</u> <u>novo</u>. The question of whether Paragraphs 1 and 9 satisfied Fed.R.Civ.P. 65(d) is also reviewed <u>de</u> <u>novo</u>. The question of whether the district court granted the injunction despite ATHI's unclean hands, is reviewed for abuse of discretion.

## ARGUMENT

### I. The expression "Tibetan *baicao* tea" cannot be monopolized as a trademark for Tibetan herbal teas.

#### A. The expression "Tibetan *baicao* tea" translates into "Tibetan herbal tea."

##### 1. The district court implicitly found that the term "*baicao*" means "herbal."

At the district court, the New York merchants argued that the term *baicao* meant "herbal," and invited[70] the district court to confirm this translation

---

[70]   A142-A143, at lines 6:25-7:4 ("The term 'Baicao' is necessarily understood to be 'herbal.' It can be verified by typing it into

simply by copying-and-pasting the two Chinese characters for *baicao* ("百草") into reliable and free internet translation services such as Google Translate[71] or Microsoft's Bing Translator[72].

In contrast, ATHI argued that the term *baicao* "doesn't mean anything."[73]  Rather, ATHI claimed that *baicao* was a "fanciful term that [ATHI's president] came up with"[74] only six years ago on or about April 8, 2009.[75]  "[C]ertainly the term 'herbal'

---

Google Translate or Microsoft's search engine. We can all see that it translates from Chinese into English as 'herbal.'"); A153, at lines 15-18 ("I do have copies of the printouts from both Google Translate and from Microsoft Bing showing you that the expression 'Baicao' in fact does translate into the word 'herbal' or 'herbs.'").

[71]  http://translate.google.com/

[72]  http://www.bing.com/translator/

[73]  A144, at line 12.

[74]  A144, at lines 17-19.

[75]  A59 (alleging date of "First Use" of the term *baicao* as "Apr. 08, 2009").

actually does not translate to 'Baicao' at all," ATHI

advised the district judge.[76]

The district court thereupon held several

hearings in which the meaning of *baicao* was

discussed. At each of these hearings, the district

court expressed its view that the term *baicao* did not

deserve protection. At the July 22 hearing, the

Court observed that "the word *baicao* is being

stretched into a trademark, which standing alone it

is not"[77]:

> "Of course, this [injunction] was drafted
> by [Appellee ATHI] and so I hope you
> will convey my view of it, that it's
> overreaching a little bit. And I would
> not regret its absence from this
> injunction. It seems to me the most
> glaring of the situations where the word
> baicao is being stretched into a
> trademark, which standing alone it is
> not. So I raise that as perhaps the most,

---

[76]     A143-A144, at lines 7:25-8:1 (emphasis added).

[77]     A127, at lines 4-5.

— 28 —

to my mind, leading candidate for amendment.

And there are other places where the description of the trademark should be made more precise and more narrow. For example, in number 12, paragraph 12, it refers to any product named, marked, or labeled or otherwise identified as Tibetan Baicao Tea 'or baicao tea.' It seems to me that the or baicao tea could well be deleted if it's identified as Tibetan Baicao Tea. We are dealing with the trademark as expressed in the pleadings and in the presentation of the case. And there may be others that can be easily clarified by an identification somewhere early in the injunction of the protected element as Tibetan Baicao Tea. And it seems to me simply from a neutral position that those might be decent clarifications to which whatever the procedural niceties, the [New York merchants] deserve."[78]

Then, on October 24, 2014, the district court again

declared that the term "'Baicao,' . . . has much

broader and separate meanings"[79]:

_____

[78]    A126-A127, at lines 32:25-33:19 (emphasis added).

[79]    A146, at lines 22-23.

"It seems to me that what we ought to do is everywhere within the present injunction that it says 'Baicao,' the word 'Baicao' standing alone or any other abridgment or any addition, such as 'or Baicao Tea,' those additions should be removed, and in their place there should be substituted the phrase 'Tibetan Baicao Tea,' no more, no less.

That follows textually and I think correctly on this record from the amended complaint. It avoids the problems arising out of the word 'Baicao,' which has much broader and separate meanings, and it is clear and definable."[80]

Finally, on December 3, 2014, the Court amended its original June 25 injunction in writing to remove protection for the terms "*baicao*" or "*baicao tea*."[81] A chart summarizing the translation issues in this case appears on Page 80 near the back of this brief.

---

[80] A146, at lines 14-23.

[81] A178-A187.

Although the district court ruled that "the term 'Baicao,' . . . has much broader and separate meanings,"[82] the district court did not explicitly articulate what *baicao*'s "broader and separate meanings" were.

However, it is plain from the district court's rationale that "the term 'Baicao,' . . . has much broader and separate meanings,"[83] that the district court had squarely rejected ATHI's argument that the term *baicao* "doesn't mean anything."[84]  Because the only definition of *baicao* proffered in this litigation was "herbs" or "herbal," we respectfully submit that the district court's ruling that the term *baicao* had "broader and separate meanings"[85] should be construed to signify a finding that the

---

[82]     A146, at lines 22-23.
[83]     A146, at lines 22-23.
[84]     A144, at line 12.
[85]     A146, at lines 22-23.

term *baicao* meant "herbs" or "herbal," even though the district court did not explicitly say so.[86]

The district court's acceptance of *baicao*'s translation as "herbs" or "herbal" can be confirmed further by the manner in which the district court amended the original June injunction.

There were four paragraphs in the original June injunction which referenced "*baicao*" or "*baicao* tea." Paragraph 10 forbade the New York merchants from infringing ATHI's suspended U.S. Trademark Application No. 85/939,652, which claimed exclusive rights to the term "*baicao*."[87] Paragraphs 13 and 14 forbade the New York merchants from marketing products bearing "the

---

[86]  Cf. <u>Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.</u>, 419 U.S. 281, 286 (1974) (a reviewing court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned").

[87]  A90 at ¶10.

*Baicao* mark" or the term "*baicao*" respectively.[88]
Finally, Paragraph 12 barred the New York
merchants from marketing any products with the
term "*baicao* tea."[89]

The district court omitted each of these
provisions in the amended December injunction[90]
without replacing them with any new provisions
regarding "*baicao*" or "*baicao* tea."  Thus, it is clear
that the district court found the terms "*baicao*" and
"*baicao* tea" to be undeserving of protection.  In
combination with the district court's statements on
the record regarding these terms, there is ample
basis for this Court to conclude that the district

---

[88]     A91 at ¶¶ 13-14.
[89]     A90 at ¶12.
[90]     <u>Compare</u> A90 ¶¶ 10 & 12-14 (paragraphs for "*baicao*" or "*baicao*
         tea" from original June injunction) <u>with</u> A185-A186 ¶¶ 1-9
         (terms from amended December injunction).

court had, in fact, construed *baicao* to mean "herbs"

or "herbal."[91]

### 2. This Court can also take judicial notice from popular literature and free internet translators that the term "*baicao*" means "herbal."

Even if the district court's pronouncements

and actions were not sufficiently clear that the term

"*baicao*" means herbal, this Court independently can

take judicial notice of *baicao*'s undisputable

translation simply by using free internet translation

services maintained by either Google®[92] or

Microsoft®[93].

Federal Rule of Evidence 201(b)(2) entitles this

Court to take judicial notice of facts that "can be

accurately and readily determined from sources

---

[91]     Cf. Bowman Transp., 419 U.S. at 286 (a reviewing court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned").

[92]     http://translate.google.com/

[93]     http://www.bing.com/translator/

whose accuracy cannot reasonably be questioned,"

and this Court has previously taken judicial notice

of such matter on other appeals.[94]

It is undisputed that the term *baicao* is the

*pinyin* Romanization of the third and fourth Chinese

characters in the five-character Chinese-language

mark.  The five-character Chinese language mark is

shown here with the two Chinese characters for

*baicao* underlined: "西藏<u>百草</u>茶".  When the two

Chinese characters for the term *baicao* (<u>i.e.</u>, "百草")

are copied-and-pasted into Google Translate®[95], the

term translates as "herbs."  The same is true on the

---

[94]     <u>E.g.</u>, <u>Rothman v. Gregor</u>, 220 F.3d 81, 91-92 (2d Cir. 2000)
(taking judicial notice of proceedings in other courts); <u>Hirsch v.
Arthur Andersen & Co.</u>, 72 F.3d 1085, 1095 (2d Cir. 1995) ("we
may take judicial notice that both Googel and Sisti pled guilty
to multiple felonies arising from their involvement in Colonial's
activities").

[95]     http://translate.google.com/

Microsoft Bing Translator®[96]: when the same two Chinese characters are inputted into Microsoft's translator, the term also translates as "herbs."

The translation of the term "*baicao*" to mean "herbal" is additionally confirmed by common usage.  Indeed, a recent book by *New York Times* best-selling physician Dr. ZhiGang Sha described the term "*baicao*" as an "ancient" and "famous" term from Chinese folklore:

> "There is a famous ancient statement: *Shen nong chang **bai cao*** . . . .  "Chang" means *taste* or *eat*.  "<u>Bai</u>" means *<u>one hundred</u>*; it represents "all" or "every" in Chinese.  "Cao" means *herbs.*  Shen Nong ("saint farmer") is the father of Chinese agriculture.  Five thousand years ago, he tasted hundreds of herbs to evaluate their healing characteristics. He wrote an encyclopedia of his findings, which includes not only herbs, plants and flowers, but also all kinds of minerals and animal parts. . . .  To this

---

[96]    http://www.bing.com/translator/

day, Shen Nong has been revered as the founder of the Chinese herbs system."[97]

In view of the consistent translations from multiple sources "whose accuracy cannot reasonably be questioned,"[98] the New York merchants respectfully request that, if this Court found the district court's pronouncements to be insufficiently clear on the meaning of the term *baicao*, this Court should take judicial notice of the fact that the term *baicao* means "herbal."

3.    **In related proceedings, the U.S. Patent & Trademark Office has determined that the term "*baicao*" means "herbal."**

In the parallel USPTO proceedings cited by the district court in its original June 2014 injunction,[99] the USPTO also determined that the

---

[97]    SHA, "TAO II" at 21.

[98]    FED.R.EVID. 201(b)(2).

[99]    A90 at ¶¶ 9 & 10; <u>see</u> <u>also</u> Statement of Related Cases, <u>supra</u>.

term *baicao* means "herbal" and that the expression

"Tibetan *Baicao* Tea" means "Tibetan Herbal Tea."

      For instance, in ATHI's application No.

85/939,652[100] for trademark registration of the term

"*baicao*," the U.S. Trademark Office issued a Jul. 7,

2013, Office Action refusing ATHI's application for

trademark registration of the term *baicao*.  In its

denial, the Trademark Office squarely rejected

ATHI's representations that the term *baicao* had no

meaning:

> "Applicant seeks to register the proposed
> mark BAICAO.  The registered mark
> consisting of the wording TIBETAN
> BAICAO TEA and five Chinese characters
> that transliterate to "Tibetan BaiCao Tea,"
> and this means 'Tibetan Herbal Tea' in
> English."[101]

---

[100]    <u>See</u> A90 at ¶10.

[101]    Office Action from U.S. Trademark Examiner Curtis French,
U.S. Trademark Application Serial No. 85/939,652
<http://tsdr.uspto.gov/documentviewer?caseId=sn85939652&do
cId=OOA20130717223514#docIndex=3&page=1> (Jul. 17, 2013).

The Trademark Office further observed that the

term *baicao* bears "a logical relationship to the

goods/services provided by the applicant . . . . [and]

appears to mean 'herbal' and is commonly used in

the industry to describe a type of tea originating

from Tibet":

> "The applicant applied to register the mark
> BAICAO.  The proposed mark merely
> corresponds to wording which is not
> arbitrary, but bears a logical relationship to
> the goods/services provided by the
> applicant.  The term BAICAO appears to
> mean 'herbal' and is commonly used in the
> industry to describe a type of tea
> originating from Tibet.  Please see attached
> articles illustrating the popularity and wide
> use of the wording Baicao or herbal tea to
> describe teas from Tibet.
>
> "The term BAICAO is merely descriptive
> of the applicant's goods/services, namely,
> herbal tea called Baicao originating from
> Tibet.  The mark immediately names the
> exact nature of the goods/services and does
> nothing else.  Accordingly, the mark is
> refused registration on the Principal
> Register . . . ."

On the same day, the U.S. Trademark Office issued an analogous refusal to register ATHI's application to trademark the five Chinese characters making up "Tibetan Baicao Tea" (i.e., "西藏百草茶").  Once again, despite ATHI's representations that the term *baicao* had no meaning, the Trademark Office found that the five Chinese characters translated from Chinese into English as "Tibetan Herbal Tea":

> "Applicant seeks to register the proposed mark consisting of Five Chinese characters that transliterate to 'Tibetan BaiCao Tea.' The registered mark consisting of the wording TIBETAN BAICAO TEA and five Chinese characters that transliterate to 'Tibetan BaiCao Tea,' and this means 'Tibetan Herbal Tea' in English."[102]

---

[102]    Office Action from U.S. Trademark Examiner Curtis French, U.S. Trademark Application Serial No. 85/894,301 <http://tsdr.uspto.gov/documentviewer?caseId=sn85894301&docId=OOA20130717223752#docIndex=3&page=1> (Jul. 17, 2013)

Additionally, citing online sources, the

Trademark Office further noted that the expression

"Tibetan Baicao Tea" was "commonly used in the

industry to describe a type of tea originating from

Tibet":

> "The proposed mark merely corresponds
> to wording which is not arbitrary, but
> bears a logical relationship to the
> goods/services provided by the applicant.
> <u>The term Tibetan BaiCao Tea is commonly</u>
> <u>used in the industry to describe a type of</u>
> <u>tea originating from Tibet.</u>"  [Emphasis
> added.]

The Trademark Office therefore concluded that the

expression "Tibetan Baicao Tea" was too

descriptive for registration on the Principal

Register:

> "The wording comprised of five Chinese
> characters that transliterate to <u>'Tibetan</u>
> <u>BaiCao Tea' is merely descriptive of the</u>
> <u>applicant's goods/services, namely,</u>
> <u>herbal tea from Tibet</u> or originating in
> Tibet.  The mark immediately names the
> exact nature of the goods/services and

does nothing else.  Accordingly, the mark is refused registration on the Principal Register."  [Emphasis added.]

The opinions of the U.S. Trademark Office regarding the registrability of terms related to *baicao* nonetheless should be given substantial persuasive weight in view of the Office's exclusive agency mandate to examine the registrability of all proposed trademarks in the United States.

Here, the U.S. Trademark Office repeatedly concluded that the term *baicao* meant "herbal," and refused to register Appellee ATHI's *baicao*-related marks.  The agency's considered opinions should thus be accorded appropriate weight in this Court's consideration of the meaning of the term *baicao*.

4.    **Even ATHI implicitly had acknowledged that the term "*baicao*" means "herbal."**

Finally, in a telling strategic slip in the district court proceedings below, even ATHI acknowledged

— 42 —

that the term "*baicao*" means "herbal."[103]  After the

district court issued its original June order enjoining

the New York merchants from using the expression

"Tibetan *baicao* tea," the New York merchants

rebranded their products as "Tibetan <u>herbal</u> tea."

ATHI then complained to the district court

that the New York merchants' use of the words

"Tibetan <u>herbal</u> tea" still ran afoul of the district

court's injunction against "Tibetan *baicao* tea":

> THE COURT: Is she selling the product in the
> meantime?  You say to a
> diminishing extent.
>
> MR. LEE:  She has changed the packaging
> that I know of and selling this.
>
> THE COURT: I see, the New Yellow Tibetan
> Herbal Tea.
>
> MR. LEE:  Yes.  <u>But inside in English it says</u>
> <u>'Tibetan Herbal Tea.'</u>  She has still
> used the same font as she used for
> the 'Tibetan Baicao Tea,' but they
> did change the 'Baicao' word into
> a couple of different characters
> called 'xenbao,' which to me is a

---

[103]    A168, at lines 4-14.

made-up term that she made up for it.  <u>But the English term is still 'Tibetan Herbal Tea.'</u>'[104]

In other words, ATHI complained that packaging labeled "Tibetan <u>Herbal</u> Tea" violated the injunction against "Tibetan <u>*Baicao*</u> Tea." However, this syllogism is only true if "Tibetan *baicao* tea" meant "Tibetan herbal tea," which in turn, would necessarily mean that the expression "*baicao*" meant "herbal."  Otherwise, ATHI's argument—that packaging marked "Tibetan herbal tea" violated the injunction on "Tibetan *baicao* tea"—would make no logical sense.

ATHI's slip is a revealing one: ATHI says that "*baicao*" means "herbal" when attempting to expand the reach of the injunction, but then tells the

---

[104]     A168, at lines 4-14 (emphases added).

court that *baicao* "doesn't mean anything"[105] when

the descriptiveness of the *baicao*-related mark is

raised.  ATHI cannot have it both ways: either *baicao*

means "herbal," or *baicao* "doesn't mean

anything."[106]  ATHI cannot shift the translation of

the term "*baicao*" from one meaning to its diametric

opposite depending on the procedural posture in

which the term is being considered.

ATHI's slip revealed the undeniable

translation of "*baicao*" as "herbal," and this

translation should be maintained consistently

throughout every aspect of this case.

**B.**    **The adjective "Tibetan" cannot be trademarked here because it is descriptive of the Tibetan herbal teas at issue.**

Since the Supreme Court's 1872 decision in <u>Canal</u>

<u>Co. v. Clark</u>, it has been well-settled in American

---

[105]    A144, at line 12.

[106]    A144, at line 12.

jurisprudence that trademark protection is unavailable for

"geographical names" because geographic names signify

only the "place of production, not []the producer, and [if]

they [(i.e., geographic terms) could] be appropriated

exclusively, the appropriation would result in

mischievous monopolies":

> "[T]he same reasons which forbid the exclusive
> appropriation of generic names or of those merely
> descriptive . . . apply with equal force to the
> appropriation of geographical names, designating
> districts of country. . . .  They point only at the place
> of production, not to the producer, and could they
> be appropriated exclusively, the appropriation
> would result in mischievous monopolies. [If] such
> phrases, as 'Pennsylvania wheat,' 'Kentucky hemp,'
> 'Virginia tobacco,' or 'Sea Island cotton,' [could] be
> protected as trade-marks; [if] any one [could]
> prevent all others from using them, or from selling
> articles produced in the districts they describe
> under those appellations, it would greatly
> embarrass trade, and secure exclusive rights to
> individuals in that which is the common right of
> many. . . .  Nothing is more common than that a
> manufacturer sends his products to market,
> designating them by the name of the place where
> they were made."[107]

---

[107]   Canal Co. v. Clark, 80 U.S. (13 Wall.) 311, 324-25 (1872).

The very principles articulated in <u>Canal Co.</u> are also codified from the Trademark Act at several places in the United States Code. For instance, Section 1052(c)(2) of Title 15 forbids the registration of trademarks which "is primarily geographically descriptive of" the applicant's goods:

> **15 U.S.C. § 1052(e)(2)**
> No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—
> . . .
> (e) Consists of a mark which . . . (2) when used on or in connection with the goods of the applicant <u>is primarily geographically descriptive of them</u>." [Emphasis added]

A different part of the Trademark Act, codified at 15 U.S.C. § 1115(b)(4), further exempts from liability the use of expressions used "to describe the goods or services . . . or their geographic origin":

"[T]he right to use the registered mark shall
be . . . subject to the following defenses or
defects:

. . . .

(4)     That the use of the name, term, or
device charged to be an infringement is a use,
otherwise than as a mark, of the party's
individual name in his own business, or of the
individual name of anyone in privity with
such party, or of a term or device which is
descriptive of and used fairly and in good
faith only to describe the goods or services of
such party, <u>or their geographic origin</u>."
[Emphasis added.]

In common usage, the word "Tibetan" is an

adjective understood to mean "of or relating to Tibet, its

inhabitants, or their language."[108]  Thus, the term

"Tibetan" is undeniably a geographic modifier.  The

record shows that both the New York merchants and

ATHI used the term "Tibetan" in "Tibetan *Baicao* Tea" to

signify a geographic connection between their respective

teas and Tibet.

---

[108]     http://dictionary.reference.com/browse/tibetan?s=t (definition
of "Tibetan") (last visited Feb. 24, 2015).

At trial, one of the New York merchants testified that her tea blend was developed by a "student who was learning the Tibetan medicine."[109]  ATHI testified that its competing tea blend was "[m]ade in Tibet[]."[110]  Thus, both the Appellant and the Appellee used the term "Tibetan" to communicate the connection between Tibet and their respective teas.

It is therefore plain that the adjective "Tibetan" used to describe the parties' herbal/*baicao* tea is "is primarily geographically descriptive of"[111] the respective teas marketed by the Appellants and the Appellee.  It is equally plain that the term "Tibetan" in "Tibetan *baicao* tea" also "describe[s] the goods or services['] geographic origin."[112]

---

[109]    A67, at lines 7-11.

[110]    A65, at lines 1-6.

[111]    15 U.S.C. § 1052(e)(2).

[112]    15 U.S.C. § 1115(b)(4).

— 49 —

As such, both <u>Canal Co.</u> and the Trademark Act preclude ATHI from preventing competing merchants of Tibetan herbal teas from using the expression "Tibetan *baicao* tea" or any foreign language equivalent, such as "Tibetan herbal tea" or the Chinese characters for Tibetan herbal/*baicao* tea.

**C.      The freedom to use geographic terms as descriptive product names is especially important for teas.**

The availability of geographic names as descriptive adjectives is especially important for tea, where geographic terms are universally recognized as shorthand for conveying the properties of a tea to everyday consumers.  Anyone who has strolled through a supermarket would likely have encountered boxes of Darjeeling, Ceylon, Assam, or even Puerh teas; these teas are named for their places of geographic origin, respectively, the Indian district of <u>Darjeeling</u> in West Bengal, the former territory of "British <u>Ceylon</u>" in the

nation of Sri Lanka, the Indian state of <u>Assam</u>, and the

Chinese city of <u>Puerh</u> in Yunnan Province.[113]

In the context of herbal teas with perceived

medicinal properties, the geographic name associated

with the tea is particularly critical. For instance, ginseng

teas are named by region ("American," "Asian,"

"Chinese," "Japanese," "Siberian" and "Wisconsin") to

denote medicinal properties and cultivation status:

> "Wild ginseng commands the highest price,
> and is limited to the plant's native range. For
> American ginseng (*Panax quinquefolius*), that
> basically means mountains east of the
> Mississippi River . . . . Wild Asian ginseng
> (*Panax ginseng*) is found only in northeastern
> China, Korea and parts of Siberia.
> Other ginseng relatives are: *Panax notoginseng*,
> found in China as *san chi* or *tien chi* ginseng;
> *Panax japonicum*, or Japanese ginseng and
> found only in Japan . . . . *Eleutherococcus
> senticsus*, sometimes called Siberian ginseng,
> is not true ginseng, but a relative in the same
> plant family . . . and labeling rules now

---

[113]   HELEN SABIERI, TEA, A GLOBAL HISTORY 16-17 (Reaktion Books 2010).

prohibit it from being marketed under the name 'ginseng.'

Cultivated ginseng is the farm-grown version . . . For generations it was cultivated in Wisconsin."[114]

Mistaking the geographic origin of one type of ginseng for another could, in fact, produce the opposite physiological effect that one might wish to elicit: "Asian ginseng and American ginseng adapted differently to their respective homes, with subtle variations in chemistry. . . <u>the Asian a stimulant, the American a relaxant</u> . . . "[115]

In the case at bar, both sets of tea-makers testified to a common belief that herbal medicinal teas from Tibet exhibited anti-allergic and anti-inflammatory properties. ATHI's president testified that her Tibetan herbal tea "help[s] to relieve the sinus and allergy" and can

---

[114]   DAVID A. TAYLOR, GINSENG, THE DIVINE ROOT 9 (Algonquin 2006) [hereinafter "TAYLOR, 'GINSENG'"].

[115]   TAYLOR, "GINSENG" at 13 (emphasis added).

"function as a detoxification agent[ and] release the heat

in the body":

> "[T]his tea can relieve tiredness, function as a
> detoxification agent. It can release the heat in
> the body. It is also very special -- if you drink
> more water with it, it can cleanse up your
> intestin[]e and your bowel.
> . . .
> . . . [T]his particular tea can enhance
> immunization of the body and hence help to
> relieve the sinus and allergy."[116]

Similarly, the New York merchant testified that

Tibetan *baicao* tea "was good for . . .  the allergy," and

could also treat inflammatory conditions such as gout and

bone pain:

> "One student who was learning the Tibetan
> medicine . . . . said it was good for the gate
> [sic: gout] and the bone pain, and also for the
> allergy."[117]

Regardless of whether there is any clinical merit to

these beliefs, it is at least clear that many people

---

[116]    A63-A64, at lines 32:17 – 33:1.

[117]    A67, at lines 11 & 20-21.

(including the parties to this litigation) perceive Tibetan

herbal tea to have specific medicinal qualities. In the

same way that consumers use the terms "Darjeeling" or

"Ceylon" to connote flavor, or the terms "American

ginseng" or "Chinese ginseng" to connote medicinal

effect—both parties used the term "Tibetan" as shorthand

to convey the health benefits of their particular herbal

teas.

The importance of geographic terms in describing

teas illustrates the wisdom behind the rules articulated by

the Trademark Act and the Supreme Court's <u>Canal Co.</u>

decision against allowing geographic terms to be

monopolized.

Here, the New York merchants have followed the

standard convention of describing their Tibetan herbal tea

as "Tibetan herbal/*baicao* tea," and their use of this

descriptive term to market Tibetan herbal teas should not

be denied under trademark law.

## II. The "catch-all" provisions of Paragraphs 1 and 9 do not state the acts enjoined with the specificity required by Fed.R.Civ.P. 65(d).

Paragraphs 1 and 9 of the Amended Injunction should be

vacated because they are not sufficiently specific under

Fed.R.Civ.P. 65(d).  For ease of consideration, we address

Paragraph 9 first.

### A. The acts that Paragraph 9 seeks to enjoin are not adequately specified, nor narrowly tailored to the issues tried below.

In its entirely, Paragraph 9 reads:

> "Making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which may or is likely to lead the trade or public, or individual members thereof, to believe that any products manufactured, imported, distributed, or sold by Defendants are in any manner associated or connected with American Tibet Health Institute, Inc., or are sold, manufactured, licensed, sponsored, approved or authorized by ATHI."

Fed.R.Civ.P. 65(d) requires all injunctions to "state its terms specifically"[118] and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required"[119]:

> "[T]he specificity provisions of Rule 65(d) are no mere technical requirements. The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood. Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed."[120]

"Rule 65(d) is satisfied 'only if the enjoined party can ascertain from the four corners of the order precisely what acts are forbidden or required.' Rule 65(d) is said to serve two general purposes: 'to prevent uncertainty and

---

[118] FED.R.CIV.P. 65(d)(1)(B).

[119] FED.R.CIV.P. 65(d)(1)(C).

[120] <u>Schmidt v. Lessard</u>, 414 U.S. 473, 476 (1974).

confusion on the part of those to whom the injunction is directed,' and to ensure 'that the appellate court knows precisely what it is reviewing.'"[121]

Within the meaning of Rule 65(d), "[a]n injunction is overbroad when it seeks to restrain the defendants from engaging in legal conduct, or from engaging in illegal conduct that was not fairly the subject of litigation. . . . [A]n injunction is overbroad if it results in a 'likelihood of unwarranted contempt proceedings for acts unlike or unrelated to those originally judged unlawful'[.]"[122]

Paragraph 9 fails to satisfy the requirements of Rule 65(d) in at least three independent respects. <u>First</u>, Paragraph 9's core proscription—precluding Appellants

---

[121] <u>City of New York v. Mickalis Pawn Shop, LLC</u>, 645 F.3d 114, 144 (2d Cir. 2011) (collecting cases) (citations omitted).

[122] <u>Mickalis Pawn Shop</u>, 645 F.3d at 145 (2d Cir. 2011) (quoting <u>Lineback v. Spurlino Materials, LLC</u>, 546 F.3d 491, 504 (7th Cir. 2008)).

"using any false designation of origin or false description
. . . which may or is likely to lead the trade or public . . . to
believe that any products . . . by [Appell]ants are . . .
associated or connected" with Appellee—was lifted
almost verbatim from the Trademark Act.

As such, Paragraph 9 is nothing more than a bare
command to obey the trademark law.  The language of
Paragraph 9 is a "catch-all" provision copied from the
generalized language of 15 U.S.C. § 1125(a)(1).  The
operative language of Paragraph 9—"using any false
designation of origin or false description . . . which may
or is likely to lead the trade or public . . . to believe that
any products . . . by Defendants are . . . associated or
connected" with Appellee— is virtually identical to the
language from the statute—"us[ing] any false designation
of origin, false . . . description . . . which . . . is likely to

cause confusion, or . . . mistake . . . as to the affiliation, connection, or association."

As this Court has explained, "an injunction must be more specific than a simple command that the defendant obey the law."[123]  Paraphrasing the language of Section 1125(a)(1) and inserting the Appellee's name into the paraphrased statute does precisely what Fed.R.Civ.P. 65(d) and this Court's precedents prohibit, and this Paragraph therefore should be vacated.

Second, Paragraph 9's scope—covering all products "sold, manufactured, licensed, sponsored, approved or authorized by [the Appellee],"[124]—impermissibly reaches far beyond the single herbal-tea product that was litigated

---

[123]  Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41, 51 (2d Cir.1996).

[124]  A186 at ¶9.

below to encompass products "not fairly the subject of litigation." [125]

It has been the consistent and firm teaching of this Court that "injunctive relief should be 'narrowly tailored to fit specific legal violations,' and that a district court must 'mould each decree to the necessities of the particular case.'"[126]

The underlying litigation relates solely to Tibetan herbal teas. However, Paragraph 9 covers much more than just the Tibetan herbal teas that were the subject of the underlying litigation— Paragraph 9 precludes the Appellant from marketing anything which might be confused with <u>any</u> products "sold, manufactured, licensed, sponsored, approved or authorized by [the

---

[125] <u>City of New York v. Mickalis Pawn Shop, LLC</u>, 645 F.3d 114, 145 (2d Cir. 2011) (quoting <u>Lineback</u>, 546 F.3d at 504 (7th Cir. 2008)).

[126] <u>Mickalis Pawn Shop</u>, 645 F.3d at 144 (2d Cir. 2011) (collecting cases) (citations omitted).

Appellee]," including the hundreds or even thousands of

the Appellee's products which were "not fairly the

subject of litigation." [127]

Third, and finally, Paragraph 9 is inadequately

specific because it conditions compliance upon how other

persons might react to the New York merchant's actions.

The injunction prohibits the New York merchants from

performing any acts "which may or is likely to lead"

others to believe that the New York merchant's goods are

somehow connected with ATHI.

There is inherent uncertainty in pegging

compliance to how someone else "may or is likely to"

react in the future. Thus, for instance, this Court has held

that an order enjoining a litigant from "trying to

intimidate plaintiffs' officers, directors, employees and

agents in the exercise of their duties with threats of

---

[127] Mickalis Pawn Shop, 645 F.3d at 145 (2d Cir. 2011) (quoting
Lineback, 546 F.3d at 504 (7th Cir. 2008)).

spurious lawsuits"[128] did not comport with Rule 65(d) because "it will be impossible for [the litigant]—a non-lawyer— to know in advance which 'threatened' lawsuits are 'spurious' and which are not"[129].

Similarly, an order to "take all other reasonably needful actions to facilitate plaintiffs' resumption of their management authority in [two businesses]" was also held to violate Rule 65(d) because there was no way for the litigant "to know what 'all other reasonably needful actions' mean[t]"[130]:

> "There is simply no way for Segal to know what 'all other reasonably needful actions' means. The phrase is undefined. Under this paragraph, Segal risks contempt if she guesses wrong about what constitutes a 'reasonably needful action,' or if she fails to accede to whatever demands the plaintiffs may make upon her in the future to 'facilitate' the exercise of their management authority. As plaintiffs' counsel admitted at oral argument,

---

[128]  <u>Peregrine Myanmar Ltd. v. Segal</u>, 89 F.3d 41, 49 (2d Cir. 1996).

[129]  <u>Peregrine Myanmar</u>, 89 F.3d at 51 (2d Cir. 1996).

[130]  <u>Peregrine Myanmar</u>, 89 F.3d at 51 (2d Cir. 1996).

this paragraph is nothing more than a 'catch-all'. The paragraph must therefore be vacated as inconsistent with Rule 65(d)."[131]

As a "catch-all" provision, Paragraph 9 was plainly not "'mould[ed] . . . to the necessities of th[is] particular case,'" [132] and the Paragraph should thus be vacated.

## B.    The acts that Paragraph 1 seeks to enjoin are not adequately specified, nor narrowly tailored to the issues tried below.

Paragraph 1 also does not meet the specificity standards of Fed.R.Civ.P. 65(d) insofar as Paragraph 1 also attempts to address matters that were "not fairly the subject of litigation" below.[133]

Paragraph 1 prohibits the New York merchants from "claim[ing] ownership of or disparag[ing] ATHI's

---

[131]    <u>Peregrine Myanmar</u>, 89 F.3d at 52 (2d Cir. 1996).

[132]    <u>Mickalis Pawn Shop</u>, 645 F.3d at 144 (2d Cir. 2011) (collecting cases) (citations omitted).

[133]    <u>Mickalis Pawn Shop</u>, 645 F.3d at 145 (2d Cir. 2011) (quoting <u>Lineback</u>, 546 F.3d at 504 (7th Cir. 2008)).

product branding or packaging by referring to it as 'old,' 'former,' or equivalent."[134]

However, the injunction had not been heard on the question of ATHI's "product branding or packaging,"[135] which Paragraph 1 seeks to remedy. As the district court pointed out, the core trademark issue in the case revolved around the words "Tibetan *baicao* tea" and not the pictures from the product branding or packaging:

> "What is always at issue is 'Tibetan Baicao Tea.' . . . I think <u>the core trademark in the sense of what is a trademark are the words, not the pictures</u>."[136]

Indeed, the district court had refused ATHI's requests to insert other provisions concerning "product branding or packaging"[137] because the issue of the picture designs on the packaging was a "separate[]" issue, and it was only

---

[134]  A185 at ¶ 1.

[135]  A185 at ¶ 1.

[136]  A160, at lines 10-16 (emphasis added).

[137]  A185 at ¶ 1.

— 64 —

the "Tibetan *baicao* tea" phrase which ATHI alleged "had

been abused and which was sought to be protected"[138]:

> "I was left with the impression that the words
> 'Tibetan Baicao Tea' could be used separately
> from any horse, scroll, or whatever. . . . And
> therefore they [the horse and scroll product
> designs and packaging] weren't a necessary
> part of the protectable unit. They [the horse
> and scroll product branding and packaging]
> might come and they might go, but it was the
> phrase 'Tibetan Baicao Tea' which had been
> abused and which was sought to be protected,
> and that they were less important."[139]

By reaching out to address "product branding or

packaging,"[140] even though the issues litigated "[we]re

the words ['Tibetan *baicao* tea']"[141] and "<u>not</u> the

pictures"[142] that comprised product packaging and

branding, Paragraph 1 impermissibly regulates matters

---

[138]    A158, at lines 7-8.

[139]    A158, at lines 1-9.

[140]    A185 at ¶ 1.

[141]    A160, at lines 10-16.

[142]    A160, at lines 10-16 (emphasis added).

that were "not fairly the subject of litigation,"[143] and the

Paragraph should therefore be vacated.

## III. Even if the expression "Tibetan *baicao* tea" could be trademarked, the district court should have denied injunctive relief on the doctrine of unclean hands.

Even assuming, <u>arguendo</u>, that "Tibetan *Baicao* Tea" were

a valid trademark, the trial court should still have denied ATHI

an injunction under the doctrine of unclean hands. The

position taken by ATHI with respect to the meaning of "*baicao*"

was so objectively unreasonable that ATHI should not have

been entitled to enjoy the benefits of equitable relief.

It is a foundational tenet of Anglo-American

jurisprudence that equity will evade the grasp of a litigant who

reaches for injunctive relief with unclean hands. A court

therefore should deny injunctive relief where the party seeking

the injunction has not acquitted itself with the measure of

---

[143] <u>Mickalis Pawn Shop</u>, 645 F.3d at 145 (2d Cir. 2011) (<u>quoting</u> <u>Lineback</u>, 546 F.3d at 504 (7th Cir. 2008)).

equity that party seeks.[144]  In the case at bar, ATHI's arguments concerning the lack of meaning of the term "*baicao*" were so pervasive and objectively unreasonable that ATHI is undeserving of any equitable relief.

As noted above, Google's free internet translator and Microsoft's free Bing® translator both agreed that the term *baicao* means "herbs."  This information was and remains freely and readily available to anyone with internet access.  Moreover, as recounted in the popular book by bestselling physician Dr. Sha,[145] the term *baicao* has been used for thousands of years.

Yet despite the undeniable translations of *baicao* to mean "herbs" or "herbal," in applying for trademark registration of the *baicao* marks in this litigation, ATHI never disclosed *baicao*'s

---

[144]  Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303, 313 (2d Cir. 1966) (Lumbard, C.J., & Hays, J., concurring) ("The plaintiff's conduct in this transaction was not consistent with the equity it seeks; it came into court with unclean hands. This, of itself, was sufficient reason why the district court should not have granted the preliminary injunction.").

[145]  SHA, "TAO II" at 21.

meaning to the Trademark Office.  To the contrary, ATHI

actively denied that *baicao* had any meaning at all.

In its application to register the term "*baicao*," ATHI

assured the U.S. Trademark Office that "[t]he word[] 'BAICAO'

has no meaning in a foreign language."[146]  ATHI repeated the

same assurances to the U.S. trademark Office in order to win

registration for "Tibetan *Baicao* Tea,"[147] and again in applying

for the Chinese-character version of "Tibetan *Baicao* Tea"[148].

Even when confronted with the Google® and Microsoft®

translations, ATHI obdurately insisted that "*[C]ertainly* the term

'herbal' actually does not translate to 'Baicao' at all."[149]  ATHI

then proceeded to embellish the statements it had made in the

Trademark Office by claiming that *baicao*—a "famous [and]

ancient"[150] term from the dawn of Chinese civilization—was, in

---

[146]   A59.

[147]   A57.

[148]   A53.

[149]   A143-A144, at lines 7:25-8:1 (emphasis added).

[150]   SHA, "TAO II" at 21.

truth, a "fanciful term that [ATHI's president] came up with"[151] only six years ago on or about April 8, 2009.[152]

Through its absurd position on the origins of the term *baicao*, ATHI initially persuaded the district court to issue an injunction forbidding the New York herbal-tea merchants from using the terms *baicao* ("herbal")[153] and *baicao* tea ("herbal tea")[154]. This wrongful injunction remained in force against the New York merchants for almost six months, during which ATHI aggressively resisted amendment of the injunction.[155]

ATHI's jaw-dropping account of how an ancient Chinese phrase had, in fact, been invented by its president only six years ago[156], coupled with ATHI's maintenance of an injunction

---

[151] A144, at lines 17-19.

[152] A59 (alleging date of "First Use" of the term *baicao* as "Apr. 08, 2009").

[153] A90-A91 at ¶¶ 10 & 13-14.

[154] A90 at ¶ 12.

[155] E.g., A145, at lines 8-9.

[156] A59 (alleging date of "First Use" of the term *baicao* as "Apr. 08, 2009").

that ATHI knew to be impermissibly overbroad, makes ATHI

an unsuitable beneficiary for equitable relief.

The unclean hands issue in this case is not simply about

retrospectively punishing ATHI for its past actions.  The

unclean hands doctrine also inherently addresses the concern of

whether, prospectively, a litigant that tries so aggressively to

seize trademark rights over a universally known expression

could be entrusted to wield responsibly the potent coercive

power of a federal injunction.  Where a litigant has so

vexatiously maintained an objectively untenable position in

litigation, that litigant ought not be entitled to enjoy the benefits

of injunctive relief, and the trial court should therefore have

withheld injunctive relief altogether under the doctrine of

unclean hands.

The case for employing the doctrine of unclean hands to

bar ATHI from all injunctive relief on matters considered below

is particularly strong here if this Court finds the expression "Tibetan *Baicao* Tea" to be too descriptive to warrant protection.

Seven out of the nine paragraphs in the Amended Injunction relate specifically to the "Tibetan *Baicao* Tea" mark (Paragraphs 2 through 8). And as argued in Part II above, the remaining two paragraphs (Paragraphs 1 and 9) are "catch-all" provisions, which do not address any specific trademark or violation.

If this tribunal agrees that "Tibetan *Baicao* Tea" is too descriptive to warrant protection, then Paragraphs 2 through 8 would need to be curtailed or vacated. However without these seven core paragraphs, the Amended Injunction would be significantly diminished, and as a practical matter, the remnant Paragraphs 1 and 9 would lack any real potency in regard to the issues in this action (assuming that they even satisfy the Fed.R.Civ.P. 65(b) narrow-tailoring and specificity requirements discussed in Part II above).

However, the fact that the remnant paragraphs might no longer form as potent an injunction doesn't mean that a studiously abusive litigant could not make vexatious use of that diminished injunction. For instance, an aggressive litigant might choose to use the remnant injunction to cow retailers into avoiding the New York merchants' products. Or the litigant might attempt to sow confusion by telling others that the Second Circuit "affirmed" the injunction.

These are not merely academic or abstract concerns; they have all actually happened in this case. Even now, ATHI continues to threaten local retailers with lawsuits if they carry any of the New York merchants' *baicao* herbal tea, even when the herbal tea is not labeled "Tibetan *baicao* tea."

Moreover, in the parallel cancellation proceedings, in an effort to lift the USPTO's stay of proceedings pending the outcome of this litigation, ATHI had incorrectly represented to the USPTO that the district judge's June interlocutory

injunction was a "judgment" and "final opinion" from which

"[n]o appeal . . . has been filed,"[157] even though the Appellants

had, in fact, already filed requests with the district court for

post-trial relief, and the undersigned counsel had already

appeared in the action to participate post-trial and appellate

proceedings.[158]  ATHI's inaccurate representations created

unnecessary proceedings at the USPTO, which then required

---

[157]  Registrant [ATHI]'s Motion to Resume at 3 ("The [district] court granted judgment on the merits in ATHI's favor on its claim of infringement of its TIBETAN BAICAO TEA mark against Kam Ng as the court permanently enjoined Kam Ng from using the TIBETAN BAICAO TEA mark shown in Registration No. 4,330,569 in all geographic areas of the United States. No appeal of the court's opinion and injunction has been filed.  The verdict and final opinion definitively establish on the merits that ATHI has priority and superior rights in its TIBETAN BAICAO TEA mark over Kam Ng.") <http://tsdr.uspto.gov/caseviewer/pdf?caseId=4330569&docInd ex=14#docIndex=14> (Jul. 15, 2014).

[158]  Compare id. (ATHI's July 15 2014 Motion to Resume to USPTO stating that district judge's June interlocutory injunction was a "judgment" and "final opinion" from which  "[n]o appeal . . . has been filed") with A17-A18 (district-court docket sheet showing multiple filings made between the June 25, 2014 date of the initial injunction, and the July 15, 2014 date of ATHI's Motion to Resume).

Appellant (Ms.) Kam Ng to devote time and resources to undoing ATHI's representations.

Naturally, if this Court finds that ATHI's litigation strategy concerning the origins of the word *baicao* was disingenuous, then plainly the doctrine of unclean hands should bar ATHI from enjoying any equitable relief. However, under the circumstances of this case, this Court need not find that ATHI acted with actual dishonesty in order to deny ATHI equitable relief to under the doctrine of unclean hands.

Here, despite overwhelming contrary evidence from internet translators, published bestsellers and even the USPTO, ATHI has obstinately maintained that "<u>certainly</u> the term 'herbal' actually does not translate to 'Baicao' at all,"[159] and that the term *baicao* was "a fanciful term"[160] that "d[id]n't mean anything"[161] and somehow was invented by ATHI's president

---

[159]    A143-A144, at lines 7:25-8:1.

[160]    A144, at lines 17-19.

[161]    A144, at line 12.

in April 2009[162].  The objective unreasonableness of ATHI's

advocacy demonstrates a degree of inequity that should

disqualify ATHI from obtaining any equitable relief to which it

might otherwise have been entitled.  ATHI's decision to

prolong litigation over this farcical issue further weighs against

ATHI on this point.

The reckless aggressiveness with which ATHI pressed its

untenable history of the term "*baicao*" serves as a predictor for

how ATHI might comport itself with *any* injunction in hand, no

matter how diminished.  A litigant who has no compunctions

about claiming that it invented the term "*baicao*" as a new

Chinese phrase in 2009—when in fact, that phrase had been in

use for <u>millennia</u>—cannot be counted on to dutifully exercise

an implement as dangerous as a federal injunction, even if the

injunction is mild.  The office of the unclean hands doctrine

---

[162]    A59 (ATHI claiming date of its "First Use" of the term *baicao* as
"Apr. 08, 2009").

ensures that injunctive decrees are not entrusted to litigants

who believe that it is reasonable to litigate in such a fashion.

If this Court finds that ATHI is not entitled to "Tibetan

*baicao* tea," the marginal benefits of retaining the two residual

catch-all paragraphs are substantially outweighed by the

likelihood for mischief, as demonstrated by the history of this

case.

## IV.     The issues raised on this appeal can be remedied directly by vacatur without further proceedings.

None of the grounds presented on this appeal, if

accepted, require a remand for further proceedings.

A remand is required only if the trial court would be in a

superior position to resolve any remaining issues from the

appeal.  A reviewing court need not remand a cause to the

district court if the matter is conclusively resolved by the

appellate judgment:

> "'An appellate court has the power to decide cases
> on appeal if the facts in the record adequately

support the proper result,' or 'if the record as a whole presents no genuine issue as to any material fact.' ('The appellate court will determine the appeal without more if ... the only contentions raised by the parties on appeal do not turn on findings of fact.'). Thus, <u>if we find that a party must prevail as a matter of law, a remand is unnecessary</u>."[163]

Remands are particularly unnecessary where, as here, the issues are decided purely on documentary evidence without requiring the credibility of witnesses to be weighed.[164]

---

[163]  <u>Chase Manhattan v. American Nat. Bank</u>, 93 F. 3d 1064, 1072 (2d Cir. 1996) (emphasis added) (quoting <u>Stetson v. Howard D. Wolf & Assocs.</u>, 955 F.2d 847, 850 (2d Cir. 1992); <u>King v. Commissioner</u>, 458 F.2d 245, 249 (6th Cir. 1972); and 9A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2577, at 522-26 (2d ed. 1994)).

[164]  <u>Male v. Crossroads Associates</u>, 469 F.2d 616, 620 n.4 (2d Cir. 1972) ("Where the record consists entirely of documentary evidence—exhibits, affidavits, answers to interrogatories, and depositions—we are as competent as the district court to determine if a genuine factual dispute exists.").

**A.    If the expression "Tibetan baicao tea" cannot be trademarked, this Court can directly vacate Paragraphs 2-8 of the Amended Injunction without remand.**

In Part I above, the New York merchants argued that the expression "Tibetan *baicao* tea" was too descriptive to be trademarked.

Seven out of the nine paragraphs in the Amended Injunction relate solely to the expression "Tibetan *baicao* tea." Specifically, these seven paragraphs are Paragraphs 2-8.[165] If this Court concludes that the expression "Tibetan *baicao* tea" cannot be trademarked, these seven paragraphs can be vacated directly without further proceedings.

**B.    If Paragraphs 1 and 9 lack the specificity required by Fed.R.Civ.P. 65(d), this Court can vacate those Paragraphs without remand.**

In Part II above, the New York merchants argued that Paragraphs 1 and 9 of the Amended Injunction

---

[165]    A185-A186 at ¶¶ 2-8.

lacked the specificity required by Fed.R.Civ.P. 65(d).  If this Court concludes that these two paragraphs do not satisfy Fed.R.Civ.P. 65(d), these two paragraphs can be vacated directly without further proceedings.

**C.    If this Court determines that the injunction was procured by unclean hands, this Court can vacate the entire injunction without remand.**

In Part III above, the New York merchants argued that ATHI's efforts to obtain injunctive relief was thoroughly contaminated by objectively unreasonable representations concerning the meaning and origins of the term *baicao*, and that no injunctive relief should have been granted as a consequence.  If this Court concludes that ATHI had, indeed, acted with unclean hands, the entire injunction can be vacated directly without further proceedings.

| Chart Summarizing Translation Issues Over "Tibetan *Baicao* Tea" | | | | | |
|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 |
| **English Mark** | Tibetan | | *Baicao* | | Tea |
| **Chinese Mark** | 西 | 藏 | 百 | 草 | 茶 |
| **Undisputed Transliteration** | | | *Bai* | *Cao* | |
| **Appellant's Translation** | "Tibet/Tibetan" | | "Herbs/Herbal"[166] | | "Tea" |
| **Appellee's Translation** | "Tibet/Tibetan" | | [No meaning][167] | | "Tea" |
| **District Court's Opinion** | | | Please see footnote.[168] | | |

---

[166]　See Argument, supra, Parts I.A-B.

[167]　See A143-A144, at lines 7:25-8:1 ("[C]ertainly the term 'herbal' actually does not translate to 'Baicao' at all."); A144, at lines 12-19 (*Baicao* "doesn't mean anything. . . . The term "Baicao" is a term that our client came up with to describe the name of the tea. . . . It is a fanciful term that she came up with."); A53 &A57 & A59 (three certifications that "The word[] 'BAICAO' has no meaning in a foreign language.").

[168]　See A126, at lines 4-6 ("[T]he word baicao is being stretched into a trademark, which standing alone it is not."); A146, at lines 22-23 (""[T]he term 'Baicao,' . . . has much broader and separate meanings."); A149, at lines 22-25 ("It seems to me that the true vision of the situation is that the trademark is 'Tibetan Baicao Tea,' and that's what should be protected, other than any single word in the group.").

## CONCLUSION

For the foregoing reasons, the Appellants respectfully request

that this Court vacate the Amended Injunction in its entirety.

Respectfully submitted,

Dated: February 27, 2015
      New York, New York

/s/ Mitchell M. Wong
_____

Mitchell M. Wong
Ashmasons LLP
Forty Wall Street, Floor 28
New York, New York 10005
Tel.:     (212) 671-1068
Fax:     (212) 202-4756
mitchell.wong@ashmasons.com

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that, in compliance with F.R.A.P. 32(a)(7)(B), the within brief contains 12,005 words (as calculated using the word-counting feature of Microsoft Word) in 14 pt. proportional font, exclusive of corporate disclosure statement, tables, and certifications.

/s/ Mitchell M. Wong
MITCHELL M. WONG

Dated: February 27, 2015

## CERTIFICATE OF SERVICE

MITCHELL M. WONG certifies as follows:

(1)    On this date, I caused Appellants' Brief and Appendix to be electronically filed and served upon all counsel of record via the ECF filing system.

(2)    On this date, I caused six hard copies of Appellants' Brief and Appendix, and six hard copies of the Appendix, to be sent via courier to:

> Catherine O'Hagan Wolfe,
> Clerk of Court
> United States Court of Appeals for the Second Circuit
> Thurgood Marshall United States Courthouse
> 40 Foley Square, New York, New York 10007

I certify under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.


/s/ Mitchell M. Wong
MITCHELL M. WONG

Dated: February 27, 2015